IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MEDINA & MEDINA, INC.,

Plaintiff,

v.                                          CIVIL NO.: 09-1098 (JAG)

HORMEL FOODS CORPORATION,

Defendant.

## REPORT AND RECOMMENDATION

## I.    PROCEDURAL HISTORY

On February 3, 2009, plaintiff Medina & Medina, Inc. ("Medina") filed a complaint in the present case against defendant Hormel Foods Corp. ("Hormel") seeking a declaratory judgment that, *inter alia*, Medina "is the exclusive retail distributor of the Hormel refrigerated products in the Commonwealth of Puerto Rico" pursuant to the Dealer's Contracts Act of June 24, 1964, No. 75 ("Law 75"), P.R. Laws Ann. tit. 10, §§ 278, *et seq.*, and that Hormel's direct sale of party platters to Costco constituted a violation of its distribution agreement with Medina under said law.  (Docket No. 1.)  On May 8, 2009, plaintiff amended its complaint, adding a claim seeking declaratory relief for Hormel's alleged breach of its obligations under Law 75 in refusing to sell Medina its new line of refrigerated retail products in March 2009.  (Docket No. 3, ¶¶ 25-28.)

On June 5, 2009, Hormel filed an answer and counterclaim against Medina seeking a declaratory judgment that 1) Medina does not have an exclusive right to purchase Hormel products in Puerto Rico, 2) Hormel is not barred from selling its products to customers outside of Puerto Rico who resell some or all of those products into Puerto Rico, and 3) that Medina does not have the right

to purchase new products introduced by Hormel into the Puerto Rico market. (Docket No. 4, p 7, ¶¶ 14-17.) Hormel also asserted a claim that Medina tortiously interfered with Hormel's relationship with its customers by threatening those customers located outside of Puerto Rico with legal proceedings unless they ceased selling Hormel products in Puerto Rico. (Docket No. 4, pp. 6, 8, ¶¶ 6-7, 18-22.) Medina filed an answer to Hormel's counterclaim on July 22, 2009. (Docket No. 10.)

Pending before the court is Hormel's motion for partial summary judgment seeking to dismiss Medina's claims to the extent they concern Hormel's sale of its products to "customers based outside of Puerto Rico" knowing that said customers re-sold a portion of those products into Puerto Rico. (Docket No. 33, p. 17.) Also pending is Medina's motion for partial summary judgment in its favor, seeking a declaration that it is "the exclusive retail distributor of Hormel refrigerated products and fresh pork in the Commonwealth of Puerto Rico pursuant to [Law] 75" and finding that Hormel "breached its obligations to [Medina] under such law."[1] (Docket Nos. 34; 40, p. 20.) Both motions have been referred to the undersigned for a report and recommendation.[2] (Docket Nos. 51; 53.)

## II.     UNCONTESTED FACTS

### A.   The Inception of the Business Relationship Between Medina and Hormel

Medina is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in San Juan, Puerto Rico. (Docket Nos. 35, p. 1; 46-1, p. 1; 3, ¶ 1; 4,

---

[1] While not explicitly stated in Medina's motion, the undersigned shall construe Medina's motion as also seeking summary judgment dismissing Hormel's counterclaim for declaratory judgment, as the claims are intertwined. However, as Medina's motion does not address Hormel's counterclaim for tortious interference with contract, to the extent Medina moves the court for summary judgment regarding this claim, said request should be DENIED.

[2] It is well settled that each cross-motion for summary judgment must be decided on its own merits. See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996.) However, "[w]here, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time." P.R. Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 133 (1st Cir. 2010).

2

¶ 1.)  Medina is engaged in the purchase and distribution of refrigerated foods in Puerto Rico, including Hormel refrigerated products for the Puerto Rico retail market.  (Docket Nos. 35, p. 1; 46-1, p. 1; 3, ¶ 1; 4, ¶ 1.)

Hormel is a corporation organized under the laws of Delaware, with its principal place of business in Austin, Minnesota.  (Docket Nos. 35, p. 2; 46-1, p. 1; 3, ¶ 2; 4, ¶ 2.)  Hormel is a multinational food corporation, that, among other things, sells its refrigerated products to Medina for distribution by the latter to retail entities in the Commonwealth of Puerto Rico.  (Docket Nos. 35, p. 2; 46-1, p. 1; 3, ¶ 2; 4, ¶ 2.)

Medina and Hormel began their business relationship in or around 1988.  (Docket Nos. 35, p. 3; 46-1, p. 2; 36-1, p. 13:21-14:4.)  José "Pepín" Medina ("José Medina"), executive vice president of Medina, first met with Jim Dinicola, Hormel's then-vice president of sales, in or around May 1987.  (Docket Nos. 35, pp. 3-4; 46-1, p. 2; 36-1, pp. 13:5-8,14:5-10.)  That fall, the two met again and Dinicola informed José Medina that Hormel was considering appointing Medina the exclusive distributor for Hormel in Puerto Rico.  (Docket Nos. 35, p. 5; 46-1, p. 2; 36-1, p. 21:20-22:18.)  However, Hormel and Medina did not reach an agreement.  (Docket Nos. 35, p. 5; 46-1, p. 2; 36-1, p. 22:10-12.)  In April 1988, several Hormel executives came to Puerto Rico and met with José Medina at a food show where Medina's booth was displaying Hormel products and the Hormel logo.  (Docket Nos. 35, p. 6; 46-1, p. 2; 36-1, pp. 22:21-23:4.)  At that time, Medina had already started distributing Hormel products in Medina trucks, at least one of which bore the Hormel logo.  (Docket Nos. 35, p. 7; 46-1, p. 3; 36-1, pp. 23:17-24:7.)

At a dinner party during that trip, Jim Dinicola told José Medina, "José, let's go ahead, you go ahead and distribute the Hormel product."  (Docket Nos. 35, pp. 6-7; 46-1, pp. 2-3, 36-1, pp.

3

22:19-23:11.)  While it is uncontested that this statement signified an agreement between the parties that Medina would distribute Hormel products, the scope, terms, and exclusivity of said agreement are disputed.[3]  (Docket Nos. 35, p. 6; 46-1, pp. 2-3; 36-1, pp. 22:21-23:11.)  No written agreement was signed then with Hormel nor has been signed to date.  (Docket Nos. 35, p. 7; 46-1, pp. 2-3; 36-1, pp. 25:22-26:9.)

B.    The Retail Products

Since the parties entered into the oral agreement, Medina has been the only local distributor of Hormel retail refrigerated products in Puerto Rico, excluding the food service line of business. (Docket Nos. 35, pp. 25, 32-33; 46-1, pp. 7, 11, 32; 37-2, pp. 12:19-13:9; 38-4, p. 11:16-20, 12:4-10.)  Furthermore, when Hormel introduced a new Hormel retail product to Puerto Rico, Medina would market it to retailers.  (Docket Nos. 35, p. 34; 46-1, p. 14; 38-4, p. 19:9-15.)  During the course of the parties' business relationship, however, there have been several instances where Medina has complained about sales of Hormel retail products by mainland distributors and wholesalers into Puerto Rico, and one instance where Medina complained about Hormel directly selling a particular retail product to a retailer.

In January 1990, José Medina complained to Hormel that Pueblo Supermarkets ("Pueblo"), a local grocery chain, had ceased buying several Hormel products from Medina because Pueblo was purchasing them at a cheaper price from Malone & Hyde, a Miami-based distributor.  (Docket Nos.

---

[3] In his deposition, José Medina stated that he understood the agreement to cover "all the meat products and all the food service products ... [a]nd fresh pork."  (Docket Nos. 33-1, p. 2; 43, p. 2; 33-4, p. 26:10-21.)  He also stated that he believed the agreement gave Medina exclusive distribution rights to sell Hormel's refrigerated products in Puerto Rico, and that Hormel could not sell to a distributor, "jobber" or wholesaler in the U.S. mainland that would then sell the products into Puerto Rico.  (Docket Nos. 33-1, p. 2; 43, pp. 3, 5; 33-5, p. 29:16-25; 33-6, p. 30:1-6.)  Hormel disputes this characterization.  To wit, Tony Alonso of Hormel, who took part in the conversation between José Medina and Jim Dinicola in which the agreement was reached, stated in his deposition that "to [his] knowledge Hormel has never offered Medina an exclusivity."  (Docket Nos. 35, p. 7; 46-1, p. 3; 46-3, pp. 36:20-37:2.)

33-1, p. 3; 43, p 4; 33-11.)  Medina requested that Hormel investigate at what price Malone & Hyde

was purchasing them in order to determine their profit margin.[4]  Id.

On September 5, 2001, José Medina wrote to Gary Ray ("Ray"), Hormel's executive vice

president of the refrigerated foods division, regarding Hormel's appointment of José Santíago, Inc.

as its food service distributor.  (Docket Nos. 33-1, p. 3; 43, p. 6; 33-17.)  In that letter, José Medina

indicated that he had recently learned that Hormel was selling party platters to mainland distributors

at a cheaper price than it offered Medina, which Medina deemed "unfair" and "undermining" to its

"selling efforts."  Id.

That same day, José Medina complained to Hormel that two local supermarket chains had

refused to have Medina supply their Hormel products because they were getting better prices through

mainland distributors, including White Rose, a distributor based in Carteret, New Jersey.  (Docket

Nos. 33-1, p. 4; 43, p. 6; 33-18; 35, p. 60; 46-1, p. 21; 39-10, pp. 7:22-8:2.)  Medina wrote:

> it is very sad to us to be presenting your products to customers here and losing the
> business because some of your mainland distributors selling into our market are able
> to get from you a better price than us.  This letter intends to get from you an
> assurance that Hormel will not put us at a disadvantage relative to other distributors
> selling into our market.  Specifically, we want your commitment that Hormel will not
> give lower prices (directly or by means of promotions, deal, etc.) to any distributor
> in the Mainland than the prices billed to us.

Id.  Hormel responded, "[c]oncerning pricing in general, you can be assured you will continue to

receive the best price on retail products sold by Hormel Foods directly into the Puerto Rico market.

It would not be reasonable to expect any greater assurance from our company."  (Docket Nos. 33,

p. 4; 43, p. 6; 33-19, p. 1.)  In a subsequent letter addressing the same issue, José Medina questioned

the use of the word "directly," stating, "as you know, some of your mainland distributors sell

---

[4]Neither party has submitted a fact as to how this issue was resolved.  (Docket Nos. 33-1; 35; 43; 46-1; 49-1.)

[Hormel retail products] directly to our customers in [Puerto Rico.]  To the extent that they get better pricing, deals, or terms than we do, we will be handicapped to grow the business here.  Thus, we certainly feel that our request is well in order and necessary to create a level playing field."  (Docket Nos. 33-1, p. 4; 43, p. 7; 33-20.)

In August 2002, José Medina wrote to Ron Fielding, Hormel's executive vice president of refrigerated foods, to complain that one of Hormel's meat group sales representatives was planning to make a presentation to the head merchandiser at Pueblo regarding Hormel's fresh pork products, thus bypassing Medina.  (Docket Nos. 33-1, p. 4; 43, p. 8; 33-25.)  Medina stated that "by giving [Pueblo] the chance to buy directly from the source, or thru [sic] a third party in the U.S.A.," Pueblo would benefit at Medina's expense.  Id.  Fielding responded:

> I assure you that we are not attempting to "sell around" [Medina]. As far as I am concerned, the customer will decide what sort of local support they require and, assuming you are their best alternative, you will be part of the program.  It is entirely up to you to sell them on the benefits you bring to the program.  We certainly cannot force them to buy through [Medina].  Once we have their needs clearly understood, we can determine whether or not you will play a role.

(Docket Nos. 33-1, pp. 4-5; 43, p. 8; 33-26.)  It is unclear how, if ever, this matter was resolved.

In June 2003, José Medina informed Hormel that White Rose had been supplying Grande, a local supermarket chain, with Hormel products "for some time", and that White Rose was opening a distribution center that would stock, among others things, Hormel products in Puerto Rico "to cater to wholesalers and retailers in our market."  (Docket Nos. 33-1, p. 5; 43, p. 8; 33-24.)  Medina stated that this development "will present serious problems and you should be aware of them and do the necessary to protect our efforts in [sic] your behalf, and mitigate problems."[5]  Id.

---

[5]Neither party has provided a specific citation to the record establishing that White Rose ever opened a distribution center in Puerto Rico.  (Docket Nos. 33-1; 35; 43; 46-1; 49-1.)  Even if it had, it is reasonable to infer that the center closed prior to 2005, as it is uncontested that – from at least as early as 2005 – Hormel sold its products to

On June 29, 2005, José Medina complained to Hormel regarding its sale of retail products to mainland wholesalers and/or retailers that operated in Puerto Rico:

> ...recently we have been able to identify a number of additional wholesalers who do business with you and who are selling Hormel [refrigerated retail meat] products in Puerto Rico, our exclusive territory, either by visiting on a regular basis our territory and/or by establishing their own operations in Puerto Rico.  At this time we refer to Boston Sausage & Provisions (Newton Center, MA), A.J.C. International (Atlanta, GA) and White Rose Foods (Carteret, NJ), although there may be others.  After a careful review and analysis of this situation, we understand that said actions, if failed to stop immediately, constitutes [sic] an impairment of our relationship with Hormel as principal, and ours as the distributors of your products in Puerto Rico.  More so when we have been able to confirm that you are selling your products to these wholesalers below the price you have quoted us for the same products. ...  It is important for us to place this situation in proper perspective because these wholesalers with operations in Puerto Rico are infringing in [sic] our relationships with you, our principal; undermining our relationship with our customers; and devaluating our company.  In fact, allowing these wholesalers to sell your products within our territory results in allowing a second or parallel distribution in the region. In view of the above, we respectfully request for you that you compel these wholesalers and/or retailers to cease and desist from interfering with our distribution of Hormel products by not selling your products in Puerto Rico, effective immediately.

(Docket Nos. 35, pp. 41-42; 46-1, p. 15; 39-1.)

Fielding replied on July 21, 2005, stating that Hormel "view[s] [Medina] as [its] retail distributor on the island of Puerto Rico," but that Hormel "cannot interfere with the legitimate purchase of [its] products in the United States" by compelling wholesalers and/or retailers to "to cease and desist from selling product in Puerto Rico."[6]  (Docket Nos. 35, pp. 42-43; 46-1, p. 16; 39-2.)  Fielding's letter concludes, "[w]hile you doubtless feel that Law 75 somehow protects you from

---

White Rose in New Jersey for re-sale in Puerto Rico.  (Docket Nos. 35, pp. 60-61; 46-1, p. 21; 39-10, pp. 7:19-8:1, 8:12-16, 12:21-13:1.)

[6]In his deposition, Fielding explained that the statement "we view [Medina] as our retail distributor on the island of Puerto Rico" to mean that Medina would be the "primary if not only" local distributor for Hormel's retail products in Puerto Rico, and that – at that time – Medina was "the only [local] distributor [Hormel] [was] using."  (Docket Nos. 35, pp. 42-43; 46-1, p.16; 38-4, p. 47:8-18.)

this competition, we do not agree." Id.  Fielding reiterated Hormel's position in an August 29, 2005 letter to José Medina, stating "as we explained, we are not going to be seen as interfering with interstate commerce." (Docket Nos. 33-1, p. 5; 43, pp. 10-15; 33-31, p. 7.)

In 2006, another dispute arose between the companies following Pueblo's decision to purchase certain products, including Hormel fresh pork, through Topco, a buyer's cooperative, rather than through Medina.  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38.)  In a January 18, 2006 letter to Gary Ray, Hormel's executive vice president of refrigerated foods, José Medina stated that he was "very upset" with "Hormel's disregard [for Medina's] exclusive distribution contract and the legal obligation to act in good faith to protect the exclusivity granted for [Medina's] territory."  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38, p. 5.)  José Medina further stated that "[t]here is no question that [Medina] is Hormel's exclusive distributor for the Commonwealth of Puerto Rico," and that a failure by Hormel to object to Pueblo's use of Topco would constitute a violation of Law 75.  Id. Ray's January 27, 2006 response states, "[c]ontrary to the assertions in your letter, we do not have any written contract with [Medina], or any exclusive distribution agreement.  For many years, [Hormel] has sold products through other brokers and distributors in Puerto Rico."[7]  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38, p. 1.)  Ray suggested that Medina negotiate directly with Pueblo, but warned that if Pueblo decided to purchase from Topco, then Hormel "ha[d] no choice but to sell fresh pork products to Topco."  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38, p. 2.)  Pueblo ultimately did not buy Hormel fresh pork products from Topco.  (Docket Nos. 43, p. 29; 43-4, p. 42:11-20; 48, pp. 2-4.)

---

[7]In his deposition testimony, Ray clarified that he was referring to mainland distributors like White Rose that sold fresh pork into Puerto Rico.  (Docket Nos. 43, p. 35;  49, p.3; 49-1, p. 5; 43-18, pp. 52:8-53:14.)

On September 19, 2008, Costco informed Medina that it would stop buying Hormel party platters from Medina due to the fact that Hormel had proposed to sell a similar tray directly to Costco – called the Supreme Party Platter – in response to Costco's request for an "upgraded platter" that would "work across all [Costco] locations." (Docket Nos. 33-1, p. 7; 35, p. 56; 43, pp. 27-28; 33-39, p. 3; 46-1, p. 20; 39-7, p. 21:14-25.) On November 10, 2008, José Medina e-mailed Hormel regarding its decision to sell the product directly to Costco, complaining that in doing so Hormel had "bypass[ed]" Medina, its "legitimate [r]etail [p]roducts [d]istributors for Puerto Rico." (Docket Nos. 43, p. 31; 49-1, p.3; 43-8.) Following a trial run extending from November 2008 to January 2009, Costco discontinued the Supreme Party Platter due to poor sales. (Docket Nos. 33, p. 7; 43, p. 28; 33-41, p. 19:5-15.) Thereafter, Costco resumed purchasing the Hormel party platters from Medina, and Medina has resumed being the sole supplier of the platter to Costco, as it was between 2002 and November 2008. (Docket Nos. 35, pp. 45, 49, 55; 46-1, p. 18-20; 39-4, pp. 16:23-17:2; 39-7, pp. 14:23-16:7, p. 21:7-13.)

In March 2009 – following the filing of the original complaint in this action – Medina and Hormel gave a joint presentation to Pueblo regarding a new line of Hormel products. (Docket Nos. 1; 35, pp. 20-21; 46-1, p. 6; 36-9, pp. 18:15-19:1.) Pueblo expressed an interest in purchasing the new products. (Docket Nos. 35, pp. 21-22; 46-1, p.7; 36-9, pp. 22:18-23:5.) However, on March 16, 2009, Patrick Schwab, the director of fresh meat sales at Hormel, sent José Medina a letter stating:

> our company views the lawsuit you filed against us an insurmountable obstacle which prevents us from making any additional products available to the Puerto Rico retail market. Thus, Hormel will not offer your company any new items, including the new fresh pork items, Precept items, and multi-pack items that were discussed in our last meeting. We will, however, continue to offer your company any products that were

9

sold prior to the initiation of the lawsuit, subject to availability.  It is very unfortunate that you are unwilling to consider entering into a written distribution agreement with Hormel.  I realize that you are not fond of contracts, but there have been far too many disagreements over the years concerning terms of our distribution relationship with your company.  A written distribution agreement is long overdue.

(Docket Nos. 35, p. 61; 46-1, p. 22; 39-11.)  That same date, Schwab also informed Pueblo of Medina's suit, stating that "[u]ntil we resolve those legal issues with [Medina], we are unable to make additional products available to your Puerto Rico locations."  (Docket Nos. 35, p. 21; 46-1, p. 7; 36-10.)

At the present, Hormel continues to sell its products, including party platters, to White Rose in New Jersey, and has done so since at least 2005.  (Docket Nos. 35, pp. 60-61; 46-1, p. 21; 39-10, pp. 7:19-8:1, 8:12-16, 12:21-13:1.)  During this period, Hormel has known that White Rose was re-selling the party platters it purchased in New Jersey to retailers in Puerto Rico, including Grande.  (Docket Nos. 35, p. 60; 46-1, p. 21; 39-10, pp. 11:14-22, 13:3-22.)

Quirch Foods, a distributor in the Southeast United States that purchases refrigerated Hormel refrigerated products both through Hormel directly and through Hispamer, a Miami-based broker employed by Hormel, sells Hormel pork picnic to retailers in Puerto Rico, including Econo and Mr. Special, although Quirch Foods does not deliver directly from Hormel to Puerto Rico.[8]  (Docket Nos. 43, p. 34; 49-1, p. 4; 43-12, pp. 46:5-8, 46:23-47:10; 35, pp. 44-45; 43, p. 34, 46-1, p.16; 39-3, p. 10:8-17;  43, p. 34; 49-1, p. 4; 43-12, pp. 50:22-51:14, 51:20-52:7.)

---

[8]  On October 31, 2007, Medina wrote to Patrick Schwab, the director of fresh meat sales at Hormel, to complain about Hormel directly supplying Quirch Foods, stating that "[a]s you know we have had this issue for some time, [I] have written directly to you about stopping it and you have elected to do what you continue to do."  (Docket Nos. 43, p. 34; 49-1, p. 4; 43-6.)

C.    <u>The Food Service Products</u>

Apart from Hormel's retail refrigerated meat products, Hormel also sells a line of "food service" products, designed for institutions like hotels and restaurants that heat, prepare and sell them to an end user, usually a consumer.  (Docket Nos. 33-1, p. 2; 43, p. 23; 33-9, p. 19:1-5.)  Medina began distributing Hormel food service products in 1988.  (Docket Nos. 35, p. 8; 46-1, p. 3; 36-1, pp. 30:7-8, 32:9-33:12.)

In July 1999, José Medina wrote to Bob Slavik of Hormel to complain that the Wyndham hotel chain, which operated five hotels in Puerto Rico at the time, had informed Medina that it was changing distributors for its Hormel food service products.  (Docket Nos. 33-1, p. 3; 43, p. 4; 33-13.)  José Medina requested a discount from Hormel to compete with the other distributor.  <u>Id.</u>  In November 2001, Hormel took the food service account from Medina, appointing an in-house broker for Ballester Hermanos as its representative for Puerto Rico.  (Docket No. 33-1, p. 4; 43, p. 7; 33-21; 3-22, pp. 34:21-35:4.)  Medina has since become one of several non-exclusive food service distributors for Hormel and continues buying food service products from Hormel, but not in the quantities it did prior to 2001.  (Docket Nos. 33-1, p. 5, 6; 43, p. 10, 15-16; 33-30, pp. 81:3-6, 81:18-25, 82:1-3; 33-32.)

In 2004 and 2005, José Medina and Ray, executive vice president of refrigerated foods at the time, exchanged several communications regarding whether supermarket delis should be considered part of Hormel's retail business.  In a January 2004 letter to Tony Alonso of Hormel, Medina complained that the proposed sale of certain sliced meat products by Hormel's food service distributor Ballester Hermanos would constitute an "improper intru[sion]" into Medina's retail distributorship.  (Docket Nos. 33-1, p. 5; 43, pp. 9-10; 33-27.)

In a June 2004 letter requesting compensation for Hormel's "unilateral" decision to take away its distribution of food service products, Medina also noted that Ballester Hermanos was presenting Hormel products in the deli departments of several of Medina's customers, which Medina called "a clear and flagrant intrusion into our retail accounts."[9] (Docket Nos. 33-1, p. 5; 43, p. 10; 33-29.)  In a September 2004 letter, Ray stated that "[Medina] is the sole distributor in Puerto Rico authorized to service the 'in the glass' and 'home meal replacement' areas of delis located within retail stores and club accounts who take possession of their products in Puerto Rico."  (Docket Nos. 33-1, p .6; 43, pp. 15-16; 33-32).  In a fax later that month, Ray clarified his prior statement:

> There are, what we consider, the "hot cafeterias" with all the hot delis that sometimes go through food service distributors.  I didn't mean to talk anything about the deli itself.  We totally agree that you have the exclusive for the deli.

(Docket Nos. 33-1, p. 6; 43, p.16; 33-33.)  Medina subsequently responded, voicing his continued dissatisfaction with Ray's "confusing" definitions of whether particular products were to be considered food service or retail, which Medina stated "has been agreed is our exclusive turf." (Docket Nos. 33-1, p. 6; 43, pp. 16-18; 33-34.)  Medina further indicated that the "deli" issue was "very sensitive" and was what "prompted [Medina] to take the decision to established [sic] a legal action."[10] Id.

In a June 22, 2005 letter, José Medina complained that Hormel food service distributors were soliciting business from retailers in Medina's territory, despite Ray's promise that they would not do so.  (Docket Nos. 33-1, p. 6; 43, pp. 18-19; 33-35, p. 1.)  In a July 1, 2005 response, Ray stated:

---

[9] Neither party submitted a fact as to whether Medina received the requested compensation.

[10] It is unclear to what legal action Medina is referring, as the complaint was filed more than four years after the communications between Medina and Ray took place.  (Docket No. 1.)

> [w]e have made it clear to our distributors ... and our people that the retail
> marketplaces is your venue.  If you have specific example of sales people visiting and
> soliciting business from retailers within your territory, please advise and we will
> make every effort to see that the practice is stopped.

(Docket Nos. 33-1, p. 6; 43, pp. 18-19; 33-35, p. 3.)

Referencing this letter, Medina's attorney sought to confirm that "as Hormel's exclusive retail distributor, [Medina] is the sole entity authorized to solicit and/or quote and/or sell Hormel products to any and/all retail accounts within Puerto Rico."  (Docket Nos. 33-1, p. 6; 43, p. 19; 33-36, p. 1.)  Hormel's counsel responded only that "Hormel has no other retail distributors in the island of Puerto Rico."  (Docket Nos. 33-1, p. 6; 43, p. 20; 33-37.)

## III.   LEGAL ANALYSIS

### A.    Summary Judgment Standard

Summary judgment shall be granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[11] "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008) (internal quotation marks and citations omitted)).   The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

---

[11]Rule 56 was amended effective December 1, 2010, after the present suit was filed.  However, "[t]he substantive standard for summary judgment remains unchanged." Tropigas De P.R. v. Certain Underwriters at Lloyd's of London, 2011 U.S. App. LEXIS 4964, at *8 n.5 (1st Cir. Mar. 11, 2011).  Therefore, since the application of the amended rule to the present case would be "feasible" and would not work an "injustice," Rule 56 – as amended – shall govern the determination of the parties' motions. Farmers Ins. Exch., 632 F.3d at 777 n.4 (citing 28 U.S.C. § 2074(a)).

Once a properly supported motion has been presented before the court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Id.

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citing Rossy v. Roche Prod., Inc., 880 F.2d 621, 624 (1st Cir. 1989)). However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987); see also Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and emphasizing that "determinations of motive and intent ... are questions better suited for the jury") (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990)).

14

**B.**     **Law 75**

Puerto Rico's Law 75 "governs the business relationship between principals and the locally appointed distributors/dealers for marketing their products.  The statute was initially enacted to avoid the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's products and/or services."  Irvine v. Murad Skin Research Lab., Inc., 194 F.3d 313, 317 (1st Cir. 1999) (citations omitted); see Caribe Indus. Systems, Inc. v. National Starch and Chemical Co., 212 F.3d 26, 29 (1st Cir. 2000).  Pursuant to Law 75, "notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause."  10 P.R. Laws Ann. § 278a.  The statute establishes a "rebuttable presumption of impairment whenever a principal bypasses a dealer by distributing merchandise directly; appoints additional dealers in contravention of the agreement; fails to adequately fill orders; or arbitrarily changes the transportation and/or payment terms."  Irvine, 194 F.3d at 318 (citing 10 P.R. Laws Ann.§ 278a-1(b)(1)-(4)).

The protection afforded dealers under Law 75 is "circumscribed by those rights acquired under the agreement regulating their business relationship. Therefore, whether or not an impairment has taken place will depend upon the specific terms of the distribution contract."  Irvine, 194 F.3d at 318; see Vulcan Tools v. Makita USA, 23 F.3d 564, 569 (1st Cir. 1994) ("[t]he question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired."). Furthermore, although non-exclusive distributors are entitled to protection under Law 75, Law 75

15

does not "operate to convert non-exclusive distribution contracts into exclusive distributions contracts." Borschow Hospital and Medical Supplies. Inc. v. Cesar Castillo, Inc., 96 F.3d 10, 14 (1st Cir. 1996) (citing Vulcan Tools, 23 F.3d at 569); see Twin County Grocers, Inc. v. Méndez and Co., Inc., 81 F.Supp.2d 276, 285 (D.P.R. 1999) ("[t]he law imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so.") (citing General Office Products Corp. v. Gussco Mfg., Inc., 666 F.Supp. 328, 331 (D.P.R. 1987)).

In this case, Medina alleges that it entered into an exclusive agreement with Hormel in 1988 to distribute the manufacturer's refrigerated retail products and fresh pork in Puerto Rico.  (Docket Nos. 3; ¶ 24; 40, pp. 1-2.)  In its motion for partial summary judgment, Medina claims that – since that time – there is no genuine issue of fact as to whether it has been the "exclusive distributor" of refrigerated retail products and fresh pork for Hormel, and that Hormel impaired the parties' relationship by 1) selling refrigerated retail products to mainland distributors, such as Quirch Foods and White Rose, who resold the goods into Puerto Rico, 2) directly selling Hormel party platters to Costco stores in Puerto Rico, and 3) refusing to introduce new Hormel products into Puerto Rico in March 2009 following the filing of this lawsuit.  (Docket No. 40, pp. 18-19.)  Medina argues that the exclusive nature of its distribution agreement is established by oral testimony and the parties' course of dealing, and is further evidenced by statements and admissions of Hormel executives. (Docket Nos. 40, pp. 12-14;  45, pp. 6-7.)  In its motion for partial summary judgment, Hormel claims that the agreement between the parties does not contemplate the sale of Hormel refrigerated goods to customers outside of Puerto Rico that resell products into the Commonwealth, that Law 75 does not impose any such term of exclusivity if it is not provided for in the contract, and that to

impose such a condition would raise constitutional issues that should be avoided.[12]  (Docket Nos. 33, pp. 1-2, 6-8, 12-15; 49, pp. 9-10.)  Hormel further argues that Medina's claims are barred by Law 75's statute of limitations, and that the distribution agreement is unenforceable because it was not committed to writing.  (Docket Nos. 33, pp. 1-2, 8-11, 15-17; 49, pp. 5-9.)

Before reaching the scope of the parties' distribution agreement, several preliminary matters shall first be addressed.

Timeliness

At the outset, Hormel contends that even assuming *arguendo* that Medina's distribution agreement with Hormel prohibited the manufacturer from selling refrigerated products to mainland distributors that resell some or all of the products into Puerto Rico, Medina's claims under Law 75 are barred by the statute of limitations.  (Docket Nos. 33, pp. 15-17; 49, pp. 5-9.)  Medina maintains that all acts of impairment claimed in the complaint occurred within three years of the filing of the present suit, thus falling within the statute of limitations.  (Docket No. 45, p. 24.)

Actions brought pursuant to Law 75 "shall prescribe in three years reckoning from the date of the definitive termination of the dealer's contract, or of the performing of the detrimental acts, as the case may be." Basic Controlex Corp. v. Klockner Moeller Corp., 202 F.3d 450, 452-453 (1st Cir. 2000) (quoting P.R. Laws Ann. tit. 10, § 278(d)).  Hormel claims that Medina's right of action accrued when Hormel "'took away' the supposedly exclusive distribution of food service products in 2001 by appointing additional food service distributors in Puerto Rico."  (Docket No. 33, p. 16.)  Alternatively, Hormel argues that Medina's claims accrued no later than January 27, 2006, when

---

[12]Hormel's motion shall be construed to also encompass Medina's claims regarding Hormel's direct sales of party platters to Costco, since Hormel explicitly addresses these sales in its motion, arguing that it never "consent[ed] to prohibit retailers like Costco from buying product for multiple store locations and moving some of the product into its Puerto Rico stores on its own."  (Docket Nos. 33, pp. 5-6; 49, p. 6.)

Gary Ray, Hormel's Executive Vice President of Refrigerated Foods, wrote to José Medina regarding Pueblo's decision to purchase Hormel fresh pork through Topco rather than Medina, and explicitly stated:

> [c]ontrary to the assertions in your letter, we do not have any written contract with [Medina], or any exclusive distribution agreement.  For many years, Hormel Foods has sold products through other brokers and distributors in Puerto Rico.

(Docket Nos. 33, pp. 16-17; 33-1, p. 6; 43, pp. 20-25; 33-38, p. 1); see Basic Controlex, 202 F.3d at 453 (defendant's announcement of its plan to use other distributors constituted a "detrimental act" under the act, triggering the statute of limitations).  Hormel also notes that Medina began complaining about mainland distributors reselling Hormel products in Puerto Rico early on in the parties' relationship.  (Docket No. 33, p 17.)

However, the fact that alleged detrimental acts occurred outside the statute of limitations does not insulate Hormel from purported detrimental acts occurring within the statutory period.  In its amended complaint, Medina's claims are premised on Hormel's direct sales of party platters to Costco stores in Puerto Rico from November 2008 through January 2009 and Hormel's decision in March 2009 not to introduce any new Hormel products for distribution in Puerto Rico, citing the filing of Medina's lawsuit.  (Docket No. 3, ¶¶ 10-11, 17-28.)  As such acts occurred within three years of the filing of the complaint in this action, they are not time-barred.  See Basic Controlex, 202 F.3d at 452-453.  Furthermore, in its opposition to Hormel's motion for partial summary judgment, Medina clarified that it is seeking a declaratory judgment that, *inter alia*, sales of Hormel retail products by mainland distributors Quirch Foods and White Rose to customers in Puerto Rico within the past three years violated Medina's exclusive distribution agreement.  (Docket No. 45, p. 3.)  While the undisputed facts show that these sales took place as early as 2001 (Docket Nos. 33-1, p.

4; 43, p. 6; 33-18), any detrimental act occurring within the statute of limitations is actionable.  Thus, where – as here – Medina has limited its claims regarding White Rose and Quirch Foods to sales occurring within the statute of limitations, such claims are not time-barred.

<u>Whether the Distribution Agreement is Exclusive</u>

Turning to the agreement itself, it is undisputed in the present case that the parties orally entered into a distribution agreement in April 1988, but that the terms of that agreement were never memorialized.  (Docket Nos. 35, pp. 6-7; 46-1, pp. 2-3; 36-1, pp. 22:21-23:11, 25:22-26:9.)  A written contract between the parties is not required to trigger the application of Law 75.  <u>R.W. Int'l Corp. v. Welch Food</u>, 13 F.3d 478, 483 (1st Cir.1994) ("[n]or can it be said that a relationship is established within the meaning of Law 75 only if it is committed to writing."); <u>see</u> <u>Madelux Int'l, Inc. v. Barama Co.</u>, 364 F. Supp. 2d 68, 74-75 (D.P.R. 2005) ("[t]he lack of a 'formal' agreement ... is not a 'legal obstacle ... to the protective cloak of Law 75.'") (citations omitted); <u>Beatty Caribbean, Inc. v. NOVA Chems., Inc.</u>, 2009 U.S. Dist. LEXIS 60910, at *42-*43 (D.P.R. July 16, 2009) ("[t]he verbal nature of the agreements is not dispositive since a relationship may be protected under the dealers' and/or sales representatives' acts even if the parties did not commit same to writing."); <u>see also</u> 10 P.R. Laws Ann. § 278(b) (defining dealer's contract as the "[r]elationship established between a dealer and a principal or grantor whereby and <u>irrespectively of the manner in which the parties may call, characterize or execute such relationship</u> ...") (emphasis added).  Instead, to determine the terms and scope of Hormel's and Medina's distribution agreement – including whether or not such agreement is exclusive – the court must look to both oral testimony as well as the course of dealings between the parties.  <u>See</u> <u>Homedical Inc. v. Sarns/3M Health Care</u>, 875 F. Supp. 947, 951 (D.P.R. 1995).

19

Medina argues that the exclusivity of its distribution agreement with Hormel is "evidenced by the legally binding admissions and explicit statements of Hormel's agents and high ranking officers" and confirmed by "the parties' course of dealing over two decades[.]" (Docket No. 45, p. 7.)  Hormel counters that Medina's past actions in fact support a finding that the agreement did not cover sales by mainland distributors and/or wholesalers to customers in Puerto Rico, as Medina was aware that such sales were occurring since 1990 but only began claiming that they impaired its distribution rights in 2005.  (Docket No. 46, p. 5.)  By contrast, Hormel argues that it has maintained throughout the course of the parties' relationship that it would not interfere with such sales.  (Docket No. 46, pp. 5-6.)

<u>Admissions</u>

While Medina asserts that statements made by Hormel executives constitute admissions that Medina's distribution agreement was exclusive (Docket No. 50, p. 5), the cited evidence does not support such a claim.  Medina points to deposition testimony by Gary Ray that Medina was the "sole distributor" for Hormel's retail refrigerated products, as well as to Ron Fielding's deposition testimony that Medina was the "only distributor" of Hormel refrigerated retail products.  (Docket Nos. 35, pp. 27, 32; 46-1, pp. 11-13; 37-2, p. 38:4-8; 38-4, pp. 26:11-18, 30:2-5; 40, p. 13.)  However, such testimony sheds little light on whether Medina's distribution agreement with Hormel was exclusive.  To wit, Fielding also stated in his deposition that Medina's distribution contract did not prohibit Hormel from selling retail products to customers in the U.S. mainland if that customer "is then going to resell all or part of its product in Puerto Rico."  (Docket Nos. 35, p. 32; 46-1, pp.11-13; 46-9, pp. 53:14-54:9.)

Medina also argues that Ray's written statements that Hormel "totally agree[s] that [Medina has] the exclusive for the deli" and that the "retail marketplace is [Medina's] venue" illustrate that Medina was Hormel's exclusive dealer for refrigerated retail meat products and fresh pork. (Docket Nos. 33-1, p. 6; 43, pp. 16, 18-19; 33-33; 33-35, p. 3; 50, p. 5.) However, as stated above, these statements concern a dispute regarding whether particular products were to be considered part of Hormel's food service or retail business – which is not at issue in the present suit – and it is thus reasonable to infer that such statements were made only in relation to Hormel's other distributors. Even if such statements, in isolation, could be construed as references to an agreement between Medina and Hormel for the former to serve as the exclusive distributor of Hormel's retail refrigerated products in Puerto Rico, Ray specifically indicated that his comments were limited to "areas of delis located within retail stores and club accounts <u>who take possession of their products in Puerto Rico.</u>" (Docket Nos. 33-1, p. 6; 43, pp. 15-16; 33-32) (emphasis added). In light of this limitation, it would be unreasonable to conclude that Ray's statements constituted an admission that Medina was Hormel's exclusive retail distributor. Therefore, Medina's assertions of alleged admissions by Hormel executives are unavailing.

<u>Course of Dealing</u>

Turning to the parties' course of dealings, it is uncontested that in April 1988 they entered an oral agreement for Medina to distribute Hormel products, that Hormel never appointed another local distributor in Puerto Rico to handle its retail refrigerated products and fresh pork, and that when Hormel would bring a new retail refrigerated product to the Puerto Rico market, Medina would

introduce it to retailers in Puerto Rico.[13]  (Docket Nos. 35, pp. 6-7, 25, 32-34; 46-1, pp. 2-3, 7, 11, 14, 32; 36-1, pp. 22:19-23:11; 37-2, pp. 12:19-13:9; 38-4, pp. 11:16-20, 12:4-10, 19:9-15.)  The parties' dispute, however, whether their agreement encompassed 1) sales made by Hormel to mainland distributors with knowledge that said distributors planned to resell the products in Puerto Rico, 2) direct sales by Hormel into the Puerto Rican market, and 3) whether the agreement required Hormel to continue to introduce new retail products into Puerto Rico following the filing of this lawsuit.  (Docket No. 40, pp. 18-19.)  The parties' conduct regarding each of these facets of their relationship shall now be examined.[14]

     a.     <u>Sales to Mainland Distributors</u>

Before determining whether the parties' agreement prohibited Hormel from selling its retail refrigerated products and fresh pork to mainland distributors that planned to resell the products in Puerto Rico, we must first address whether  Law 75 provides such protection to local distributors like Medina.

In <u>Irvine v. Murad Skin Research Lab.</u>, the First Circuit held that

> [a] principal may not be held accountable for unknown market interference by third parties.  However, once put on notice that its products are reaching an area of limited distribution rights a principal has the obligation to take prompt positive action to curtail the practice.

---

[13]While such facts certainly serve as evidence that Medina was Hormel's exclusive local distributor for retail refrigerated products and fresh pork, it is insufficient to grant Medina summary judgment on this issue (Docket No. 34), to the extent such relief is sought.  Testimony by Hormel executives Tony Alonso and Ron Fielding, as well as Ray's January 2006 letter stating "[Hormel] do[es] not have have any written contract with [Medina], or any exclusive distribution agreement" –  raise issues of fact as to whether Hormel viewed Medina as its "exclusive" distributor, or just as the only distributor it currently employed.  (Docket Nos. 33-1, p. 6; 33-38, p. 1; 35, pp. 7, 42-43; 43, pp. 20-25; 46-1, pp. 3, 16; 46-3, pp. 36:20-37:2; 38-4, p. 47:8-18.)

[14]To the extent Hormel cites incidents involving Medina's food service line of business as opposed to its distribution of Hormel's retail refrigerated products  and fresh pork as evidence of the parties' relationship, (<u>see</u>, <u>e.g.</u>, Docket Nos. 33, pp. 7, 16; 49, pp. 2, 7), such incidents shall not be taken into account in making a recommendation regarding the terms of the parties' distribution agreement since Medina is not claiming exclusivity as to that portion of its business.

Irvine v. Murad Skin Research Lab., 194 F.3d 313, 318 (1st Cir. 1999).  Irvine involved claims that Murad, a stateside manufacturer of skin care products, had violated the terms of its distribution agreement with IRG – pursuant to which IRG would be the exclusive distributor of Murad's products in Puerto Rico – by inadvertently broadcasting an infomercial regarding its products in Puerto Rico, thereby making said products available to the Puerto Rico retail market via telemarketing. Id. at 315. The court held that Murad was not required to "stand as a vigilant dog," but that once it had been informed of the error, Murad had an "affirmative duty to ensure that the direct sales would cease and avoid further interference with the Puerto Rico market." Id. at 318 (quoting General Office Products Corp. v. Gussco Mfg., Inc., 666 F. Supp. 328, 333 (D.P.R. 1987)).

Hormel argues that Irvine should be read narrowly, and that its holding should only apply to cases involving direct sales by a manufacturer to customers in Puerto Rico.  (Docket No. 33, p. 13 n. 7.)  Instead, Hormel relies on DiGiorgio Corp. v. Mendez & Co., 230 F. Supp. 2d 552 (D.N.J. 2002), a District of New Jersey case holding that under Law 75, "an exclusive distributor does not have the right to enjoin transactions that take place outside Puerto Rico, even if the products are exchanged for ultimate resale in Puerto Rico."[15]  Id. at 567.  In DiGiorgio, Mendez and Co., Inc. ("Mendez"), a Puerto Rico distributor that had entered exclusive distribution contracts with several grocery suppliers, brought counterclaims for tortious interference with contract against A. Cordero Badillo, Inc. ("Grande"), a chain of grocery stores in Puerto Rico, and DiGiorgio Corporation ("DiGiorgio"), a New Jersey-based grocery distributor, based on allegations that Grande was purchasing products covered by said agreements from DiGiorgio in the United States and then

---

[15] While the court in DiGiorgio applied New Jersey law, it found "no conflict between New Jersey and Puerto Rico tortious interference law."  230 F Supp. 2d at 559.

shipping them to Puerto Rico.  Id. at 553-54.  Finding that such transactions did not "affect Mendez's contractual rights," the court granted summary judgment to DiGiorgio and Grande.  Id. at 567.

This court has since addressed DiGiorgio, however, and while it adopted the case's reasoning, it did so only to the extent the transactions at issue were between non-parties to the distribution agreement.  Sterling Merchandising, Inc. v. Nestle, S.A., 546 F. Supp. 2d 1, at *3-*4 (D.P.R. 2008).  In Sterling, the court dismissed distributor Payco Foods Corp.'s ("Payco") counterclaims for tortious interference with contract based on the sale of ice cream products by Schoep's Ice Cream ("Schoep's") to Sterling Merchandising Inc. ("Sterling"), neither of which were party to Payco's alleged exclusive agreement with Masterfoods Interamerica ("MFI") to distribute MFI's products in Puerto Rico.  Sterling Merchandising, 546 F. Supp. 2d at 4.  The court held that "Sterling's eventual resale of the products brought from Schoep's in Puerto Rico, as in DiGiorgio, cannot be said to have interfered with Payco's rights pursuant to the contract with MFI."  Id. at 3. In so doing, the court emphasized the fact that the transaction was between two strangers to the distribution agreement, stating

> Sterling's action of buying products from Schoep's, a stranger to the Payco-MFI agreement, outside of [Puerto Rico], was an arm-length transaction which cannot be curtailed by a contract perfected within [Puerto Rico]'s boundaries among parties other than Schoep's and Sterling.

Id. at *4.

The present case is not on all fours with either Irvine or the tandem of Sterling and DiGiorgio with regard to where the transactions at issue took place and whether they involved parties to the distribution agreement.  In the district court cases, the transactions occurred outside of Puerto Rico, but the claims were against third parties.  In Irvine, the sales took place within Puerto Rico, but the

24

transaction involved Murad, the manufacturer, which was obviously a party to the distribution agreement.  Here, the transactions at issue – Hormel's sales to mainland distributors such as Quirch and White Rose – involved a party to the distribution agreement, <u>and</u> the sales took place outside of Puerto Rico.  However, <u>Sterling</u> suggests that the more significant factor is that the transactions involved a party to the distribution agreement.  Indeed, the court in <u>Sterling</u> stated "[i]t is MFI, Payco's counterpart to the exclusivity contract, who is in better position to prevent any harm to Payco's rights under the contract.  It appears from the complaint, however, that MFI continued to sell to Schoep's even after it learned that it was selling MFI products to Sterling despite MFI's instructions to the contrary." <u>Id.</u> at 4.  Likewise, in <u>DiGiorgio</u> the court indicated that "Mendez has an alternative means of protecting its alleged contract rights – suit against the [s]uppliers for breach of the alleged agreements."[16]  <u>DiGiorgio</u>, 230 F. Supp. 2d at 565.  Coupled with the First Circuit's broad language in <u>Irvine</u> triggering a principal's duty to protect the distributor's rights whenever "products ... reach[] an area of limited distribution," <u>Irvine</u>, 194 F.3d at 318, it is therefore concluded that Law 75 covers such transactions.  Whether or not – in this case – these transactions were contemplated in the parties' oral agreement, however, is indicated by their course of conduct in view that, as previously stated, Medina has failed to bring any explicit admission or statement to that effect.

The uncontested facts show that from 1988 to June 2005, Medina did not question the right of mainland distributors to sell Hormel products in Puerto Rico, despite being aware that such sales were taking place.  Indeed, while Medina complained to Hormel about these distributors, its complaints focused on whether mainland distributors were getting better prices on Hormel products.

---

[16]However, the opinion elsewhere states that the transactions in question did not "affect Mendez's contractual rights[.]"  <u>DiGiorgio</u>, 230 F. Supp. 2d at 567.

In January 1990, Medina complained to Hormel that Pueblo had stopped buying several Hormel products from Medina because Pueblo was purchasing them at a cheaper price from a Miami-based distributor.  (Docket Nos. 33-1, p. 3; 43, p 4; 33-11.)  Medina requested that Hormel investigate at what price the distributor was buying these items.  Id.  Likewise, in a September 5, 2001 letter to Gary Ray, Hormel's executive vice president of refrigerated foods, José Medina indicated that he had recently learned that Hormel was charging mainland distributors less for products such as party platters, which Medina deemed "unfair" and "undermining" to its "selling efforts."  (Docket Nos. 33-1, p. 3; 43, p. 6; 33-17.)  That same day, José Medina also complained to Hormel about two local supermarket chains that had refused to have Medina supply their Hormel products because they were getting better prices through mainland distributors, including White Rose.  (Docket Nos. 33-1, p. 4; 43, p. 6; 33-18.)  Focusing again on price, Medina wrote:

> it is very sad to us to be presenting your products to customers here and losing the business because some of your mainland distributors selling into our market are able to get from you a better price than us.  This letter intends to get from you an assurance that Hormel will not put us at a disadvantage relative to other distributors selling into our market.  Specifically, we want your commitment that Hormel will not give lower prices (directly or by means of promotions, deal, etc.) to any distributor in the Mainland than the prices billed to us.

Id.  In a subsequent letter addressing the same issue, Medina stated, "as you know, some of your mainland distributors sell [Hormel retail products] directly to our customers in [Puerto Rico.]  To the extent that they get better pricing, deals, or terms than we do, we will be handicapped to grow the business here.  Thus, we certainly feel that our request is well in order and necessary to create a level playing field."[17]  (Docket Nos. 33-1, p. 4; 43, p. 7; 33-20.)

---

[17] In addition, Medina complained in 1989 and 1996 of instances where Hormel sold meat products to exporters. (Docket Nos. 33-1, p. 3; 43, p.4; 33-10; 33-12.)  However, these complaints did not focus on price or exclusivity, but rather on the fact that Hormel either refused to sell certain products to Medina or did not offer the company the product first.  Id.  Medina also references a June 2003 letter in which José Medina informed Hormel that mainland distributor White Rose had been supplying Grande, a local supermarket chain, with Hormel products, and that White Rose was

It is only in 2005, approximately seventeen years after the parties' relationship began, that Medina first questioned Hormel's right to sell its frozen products to mainland distributors knowing that they planned to resell them in Puerto Rico.  On June 29, 2005, José Medina demanded that Hormel compel mainland wholesalers and/or retailers that sold Hormel retail refrigerated meat products into Puerto Rico to "cease and desist" from "interfering with [Medina's] distribution of Hormel products." (Docket Nos. 35, pp. 41-42; 46-1, p. 15; 39-1.)   In a July 2005 letter, Medina's attorney requested that Hormel confirm that "as Hormel's exclusive retail distributor, [Medina] is the sole entity authorized to solicit and/or quote and/or sell Hormel products to any and/all retail accounts within Puerto Rico."  (Docket Nos. 33-1, p. 6; 43, p. 19; 33-36, p. 1.)  In October 2007, Medina wrote to the director of fresh meat sales at Hormel to complain about Hormel directly selling its retail products to Quirch Foods, stating that "[a]s you know we have had this issue for some time, [I] have written directly to you about stopping it and you have elected to do what you continue to do."  (Docket Nos. 43, p. 4; 49-1, p. 4; 43-6.)

However, even then, Hormel was consistent in maintaining that its agreement with Medina did not prohibit such sales.  Following Medina's June 2005 letter, Fielding responded that Hormel "view[ed] [Medina] as [its] retail distributor on the island of Puerto Rico," but that Hormel "cannot interfere with the legitimate purchase of [its] products in the United States."[18]  (Docket Nos. 35, pp.

---

opening a distribution center in Puerto Rico that would stock Hormel products, among other things.  (Docket Nos. 33-1, p. 5; 43, p. 8; 33-24.)  Medina stated that this development "will present serious problems and you should be aware of them and do the necessary to protect our efforts in [sic] your behalf, and mitigate problems."  Id.  It is unclear whether Medina's request that Hormel "mitigate [the] problems" signified a pricing issue or whether Medina is seeking to protect its distribution territory.  Furthermore, as noted previously, neither party has provided a specific citation to the record establishing that White Rose ever opened a distribution center in Puerto Rico.  (Docket Nos. 33-1; 35; 43; 46-1; 49-1.)

[18] As stated above (supra n.6), Fielding clarified during his deposition that his statement "we view [Medina] as our retail distributor on the island of Puerto Rico" meant that Medina would be the "primary if not only" local distributor for Hormel's retail products in Puerto Rico, and that – at that time – Medina was the only distributor Hormel was using.  (Docket Nos. 35, pp. 42-43; 46-1, p.16; 38-4, p. 47:8-18.)

42-43; 46-1, p. 16; 39-2.)  Fielding's letter concluded, "[w]hile you doubtless feel that Law 75 somehow protects you from this competition, we do not agree."  Id.  Fielding reiterated Hormel's position in an August 2005 letter, stating "as we explained, we are not going to be seen as interfering with interstate commerce." (Docket Nos. 33-1, p. 5; 43, pp. 10-15; 33-31, p. 7.)  Furthermore, in a subsequent letter regarding Pueblo's decision to purchase Hormel fresh pork through Topco, Ray stated: "[c]ontrary to the assertions in your letter, we do not have any written contract with [Medina], or any exclusive distribution agreement.  For many years, [Hormel] has sold products through other brokers and distributors in Puerto Rico."[19]  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38, p. 1.)  Ray also warned that if Pueblo decided to purchase from Topco, then Hormel "has no choice but to sell fresh pork products to Topco."  (Docket Nos. 33-1, p. 6; 43, pp. 20-25; 33-38, p. 2.)

Based on the foregoing, no rational jury could find that the parties' agreement contemplated sales by Hormel to mainland distributors that resold Hormel products in Puerto Rico.  For the first approximately 17 years of the parties' relationship, Medina never complained about such sales, despite being aware that they were taking place.  In fact, Medina's complaints during this period explicitly acknowledged and accepted that Hormel employed other mainland distributors to service the Puerto Rico market, requesting that Hormel "not put [Medina] at a disadvantage relative to other distributors selling into our market, [i.e. Puerto Rico]" and stating that Medina's request that Hormel not charge mainland distributors lower prices was necessary "to create a level playing field" with other distributors.  (Docket Nos. 33-1, p. 4; 43, pp. 6-7; 33-18; 33-20.)  Furthermore, when Medina finally complained about the issue in 2005, Hormel stated repeatedly that it could utilize other companies to distribute its products in Puerto Rico.  (Docket Nos. 33-1, pp. 4-6; 35, pp. 42-43; 43,

---

[19]As stated above (supra n.4), in his deposition, Ray indicated that this statement referred to distributors such as White Rose that sold fresh pork into Puerto Rico.  (Docket Nos. 43, p. 35;  49, p.3; 49-1, p. 5; 43-18, pp. 52:8-53:14.)

pp. 8, 10-15, 20-25; 33-26; 33-31, p. 7; 33-38; 39-2; 46-1, p. 16.)  Therefore, Hormel's motion for partial summary judgment (Docket No. 33) should be GRANTED as to Medina's claims that Hormel's sales to mainland distributors, such as White Rose and Quirch, that resold the products into Puerto Rico constituted a violation of the parties' distribution agreement.

      b.    <u>Direct Sales to Costco</u>

As for the parties' conduct regarding direct sales by Hormel to the Puerto Rico market, the undisputed facts reveal that Medina consistently maintained throughout the parties' relationship that such sales were in violation of the parties' distribution agreement.  However, the record also contains evidence that Hormel disputed this claim.

In August 2002, José Medina complained to Ron Fielding of Hormel that a Hormel sales representative was planning to make a presentation to Pueblo regarding Hormel's fresh pork products, thus bypassing Medina.  (Docket Nos. 33-1, p. 4; 43, p. 8; 33-25.)  Fielding reassured Medina that Hormel was not trying to "sell around" the distributor; however, he was also non-committal about whether Hormel was required to go through Medina, stating "[Hormel] certainly cannot force [the retailer] to buy through [Medina].  Once we have their needs clearly understood, we can determine whether or not you will play a role."  (Docket Nos. 33-1, pp. 4-5; 43, p. 8; 33-26.) Years later, when Costco informed Medina in September 2008 that it would stop buying Hormel party platters from them because Hormel was planning on directly selling a similar tray to Costco, Medina complained again to Hormel, stating that by directly selling its products to Costco, Hormel had "bypass[ed]" Medina, its "legitimate [r]etail [p]roducts [d]istributors for Puerto Rico."  (Docket Nos. 43, p. 31; 49-1, p. 3; 43-8; (<u>see</u> Docket No. 40, p. 16.)

29

In view of the above, a reasonable jury could – but is not required to – find that the distribution agreement covered direct sales by Hormel to the Puerto Rico market. Therefore, both Hormel's (Docket No. 33) and Medina's (Docket No. 34) motions for partial summary judgment should be DENIED as to whether Hormel's direct sales of party platters to Costco violated the distribution agreement.

        c.      <u>Sales of Future Hormel Products</u>

In its complaint, Medina also asserts that Hormel violated the parties' distribution agreement by "refusing" to sell Medina several refrigerated products that the two companies had jointly presented to a number of retail clients in Puerto Rico, including Pueblo. (Docket No. 3, ¶¶ 3, 17-19, 26-28.) However, Medina does not allege – nor does is there any evidence on the record – that Hormel used another Puerto Rico-based company to distribute these items, or that Hormel sold them directly to the Puerto Rico market. (Docket No. 3.) Instead, the undisputed evidence indicates that said products were never brought to market. In a March 2009 letter to José Medina, the director of fresh meat sales at Hormel stated that the present lawsuit was an "insurmountable obstacle which prevents [Hormel] from making any additional products available to the Puerto Rico retail market." (Docket Nos. 35, p. 61; 46-1, p. 22; 39-11.) Hormel informed Pueblo of the same, stating that "[u]ntil we resolve those legal issues with [Medina], we are unable to make additional products available to your Puerto Rico locations." (Docket Nos. 35, p. 21; 46-1, p. 7; 36-10.) Thus, although under Law 75 there is a presumption that an existing relationship between a principal and a distributor has been impaired where the principal "unjustifiably refuses or fails to fill the order for merchandise sent to him by the dealer in reasonable amounts and within a reasonable time," this presumption does not apply in this case because the items at issue were never introduced to the

Puerto Rico market.  <u>See</u> P.R. Laws Ann. tit. 10 § 278a1(b)(3).  In light of the above, it is hereby recommended that Medina's motion for partial summary judgment (Docket No. 34) be DENIED as to Medina's claim that such conduct constituted a violation of the parties' distribution agreement.[20]

## IV.    CONCLUSION

In sum, lacking a written contract evincing the terms of the parties' distribution agreement, Medina sought to demonstrate the parties' intent through their course of conduct and by statements made by Hormel executives.  Medina's assertions regarding such admissions, however,  are unavailing.  As to Medina's claims that the distribution agreement covered sales by Hormel to mainland distributors such as White Rose and Quirch that re-sold the products into Puerto Rico, the uncontested facts show that Medina did not complain about such sales for approximately 17 years despite being aware of them, while Hormel maintained throughout the parties' relationship that such sales were permitted.  Thus, no rational jury could find that the distribution agreement covered such sales.  Regarding Medina's claims involving Hormel's direct sale of party platters to Costco, there is evidence that Medina complained on a prior occasion regarding a similar incident, although – on the other hand – Hormel never admitted such sales were prohibited.  Based on these facts, a rational jury could find for either party on this issue.  As for Medina's claims that Hormel refused to bring new retail products to the Puerto Rico market after Medina filed its lawsuit, there is no evidence that this constituted a violation of Law 75 since there is no allegation that Hormel used another distributor to market the products to Puerto Rico retailers or that Hormel unjustifiably refused to fill orders for a previously available item.

---

[20]As Hormel's motion for partial summary judgment (Docket No. 33) only seeks to dismiss Medina's claims to the extent they concern sales to distributors based outside of Puerto Rico that re-sell the products into Puerto Rico, it does not address Medina's claims regarding sales of new Hormel products.

In view of the foregoing, Hormel's motion for partial summary judgment (Docket No. 33) – seeking dismissal of Medina's claims involving sales to mainland distributors – should be GRANTED.  Medina's motion for partial summary judgment (Docket No. 34) in support of its complaint and seeking to dismiss Hormel's counterclaim for declaratory judgment should be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation.  Fed R. Civ. P. 72(b); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 23rd day of August, 2011.

s/Marcos E. López
U.S. Magistrate Judge